## PORTLAND GAS LIGHT COMPANY

v.

### Ernest H. JOHNSON, State Tax Assessor.

Supreme Judicial Court of Maine.

Aug. 8, 1968.

James R. Flaker, Portland, for plaintiff.

Jon R. Doyle, Asst. Atty. Gen., Augusta, for defendant.

Before WILLIAMSON, C. J., and WEBBER, TAPLEY, MARDEN and WEATHERBEE, JJ.

MARDEN, Justice.

On report. To a use tax assessed under our sales and use tax law (Act) (36 M.R.S.A. § 1751 et seq.) against the plaintiff on coke used in the manufacture of "carburetted water gas," which plaintiff sells at retail, plaintiff appealed under Rule 80B M.R.C.P. to the Superior Court. From that Court the case was reported upon an agreed statement of facts.

The part which coke plays in the manufacturing process is stipulated as follows:

"5. Concerning the use of the coke in the manufacturing process, the following facts are stipulated:

"During the period in question, the Plaintiff Portland Gas Light Company produced 'carburetted water gas' at its Portland plant for distribution to its customers. A three shelled carburetted water gas machine was used for the production of the gas. The three shells of the machine were thoroughly insulated and consisted of a generator, carburetter and superheater connected to a stack which has a lid and a connection to a gas holder or tank.

"The raw materials used in the production of the 'carburetted water gas' are coke, air, water (in the form of steam), and oil.

"The process of producing the water gas commences in the first shell of the machine, the generator, which has an ash pit and grates. A four foot layer of coke on the grates is ignited and air is blown through the coke until the coke reaches a state of incandescence sufficiently high enough to react efficiently with steam. When the temperature of the coke is high enough to so react the lid on the stack which has been opened while the air

is being blown through is closed and steam is passed up through the coke.

"A chemical reaction takes place between the incandescent coke and steam and the gas which results from this reaction flows from the generator into the carburettor. When the gas resulting from the reaction of the coke and steam reaches the carburetter, oil is sprayed into the gas steam. The mixture then flows into the superheater and while passing down through flues becomes stablized. The stablized gas leaves the machine through the connection in the stack, passes through a water seal in which most of the tar is removed. The gas then passes into a gas holder and is ready for purification. The production of 'carburetted water gas' is a cyclic process in which there are two basic periods:

"1. *BLOW*—In this cycle the mass in the generator is heated to a reaction temperature by passing air over the incandescent coke. During this portion of the cycle, coke is burned for the purpose of raising the temperature of the coke bed so it will react in a later portion of the cycle with steam to produce gas.

"2. *RUN*—In the run cycle the steam passes through the coke bed and reacts with the coke to produce the carburetted water gas which is a product of the operation. This portion of the cycle absorbs heat from the coke bed, cooling it to a point where it must again be reheated by returning to the 'blow' or first portion of the cycle. The heat energy released during the 'blow' is largely absorbed during this period and provides the basic heat content of the gas which is sold at retail.

"A cycle is approximately three minutes long and is broken down in the following percentages of time.

| | |
|---|---|
| Blow | *27%* |
| Run | *73%* |

"6. The operation of a gas generating facility which uses coke as a source of carbon for the production of fuel gas utilizes a portion of the coke to furnish the heat necessary for the reactions. Another portion of the coke enters into the manufacture of gas.

"Expert information indicates that 34.-6% of the coke used is consumed during the blow and the remaining 65.4% during the run."

The amount of the use tax assessed on the coke during the period in question is $13,385.58. It is stipulated that if no portion of the coke used during the reference period is subject to a use tax, the tax should be abated in the amount of $13,385.-58. It is also stipulated that if a portion of the coke used is not subject to a use tax then that portion of $13,385.58 is to be abated.

. The statute, the interpretation of which will control the issue, is 36 M.R.S.A. § 1752, subsection 11, in which retail sale is defined, and the pertinent portions of which are as follows:

" 'Retail sale' or 'sale at retail' means any sale of tangible personal property, in the ordinary course of business, for consumption or use, or for any purpose other than for resale, except resale as a casual sale, in the form of tangible personal property * * *

\* \* \* \* \* \*

" 'Retail sale' and 'sale at retail' do not include the sale of tangible personal property which becomes an ingredient or component part of, or which is consumed or destroyed or loses its identity in the manufacture of, tangible personal property for later sale but shall include fuel and electricity. It shall be considered that tangible personal property is 'consumed or destroyed' or 'loses its identity' in such manufacture, if it has a normal physical life expectancy of less than one year as a usable item in the use to which it is applied * * *."

Plaintiff argues exemption from taxability for two reasons, (1) that the purchase of this coke is "in reality, the purchase of tangible personal property (heat energy) for resale," and (2) that this coke "which is consumed in the process of manufacture of carburetted water gas, is used as a basic raw material and basic energy source for the end product, and not as a fuel." Defendant does not deny that the gas sold by plaintiff is subject to a sales tax.

The defendant contends that the statute, as interpreted in Androscoggin Foundry Company v. Johnson, 147 Me. 452, 88 A.2d 158 requires him to tax the coke in question.

The resolution of the issue is to be found in applying the statute to the facts peculiar to the process of manufacture here involved.

Preliminarily plaintiff concedes that the coke in question is tangible personal property as defined by the Act, and neither party contends that its "life expectancy" in this industry is such as to save it from taxation. Its taxability depends upon its function in the plaintiff's manufacturing process and whether such function entitles it to tax exemption, within the provisions of subsection 11, § 1752, supra. Upon acceptance of either of plaintiff's contentions that (1) the purchase of the coke is in reality the purchase of heat energy converted into gas for resale, or (2) that it in toto becomes an ingredient of the gas later sold at retail, exemption from taxation might be established. This theory of tax exemption was advanced unsuccessfully as to coal used in generating electricity in Farrand Coal Company v. Halpin, 10 Ill.2d 507, 140 N.E.2d 698 [5], 701 (1957), although it is to be noted 1) that the Illinois Retailers Occupation Tax Act contained no definition of "tangible personal property" and 2) that the distribution of electricity was not a sale at retail.

The facts, however, do not require the issue to become an "either or" issue. An intermediate ground is established by the stipulation that "(e)xpert information indicates that 34.6% of the coke used is consumed during the blow and the remaining 65.4% during the run."

While *Androscoggin Foundry Company* held that coke used in an iron foundry was fuel and included "without limitation" as subject to taxation under the Act, even though a substantial portion (stipulated as 50%) of the carbon from that coke became an ingredient of the cast iron, the coke so used was for heating purposes and the transfer of a substantial portion of its carbon into the molten iron which it heated was incidential to its primary use as a fuel.

Here in the "blow" cycle of manufacture,[1] the coke is burned over forced draft (Morgan p. 366) until the temperature of the coke bed is sufficiently high to react with additives in the "run" cycle. This is a heating process. (Morgan, pp. 367, 452). During the "run" cycle, the heat from the incandescent coke is absorbed, lowering the temperature of the coke bed to a point where it must again be reheated by returning to the "blow" cycle. It is during the "run" cycle, when the endothermic reaction occurs between the white hot coke and the steam additive, that 65.4% of the coke is consumed and its latent heat energy,—in plaintiff's terms, is transferred to the gas product to be later released through combustion of the gas. The coke consumed in this cycle is by chemical reaction, not by combustion. The coke is not sustaining fire or producing heat during this period. Its fire is being extinguished and its production of heat is being suppressed,—the antithesis of the function of fuel. Fuel is "combustible matter used to kindle or sustain fire or produce heat" Standard Dictionary and quoted in Androscoggin, 147 Me., page 456, 88 A.2d, page 160: "any matter used to produce heat or power by burning, * * * [that which feeds fire]" Webster's New International Dictionary.

1. See generally "American Gas Practice" 2d. Ed. Jerome J. Morgan, cited throughout as "Morgan p. ——."

Certain it is that during the "blow" cycle when heat is generated, there is heat loss by radiation, by venting through the stack and by incomplete combustion (Morgan p. 368). It cannot seriously be contended that this lost heat energy is synthesized into the end product. Such heat loss would vary in proportion to the efficiency of the generator and several other factors (Morgan p. 368). The record offers no basis for apportioning this waste between the "blow" and "run" cycles, although logic would suggest that stack loss and that from incomplete combustion would be confined to the first cycle and that radiation loss would be a factor in both cycles. This heat energy so wasted prevents full acceptance of either of plaintiff's contentions. While the stipulated percentages of coke consumption apportioned between the "blow" and the "run" total 100%, it is obvious that 100% of the heat energy released by the coke is not captured in the end product.

Accepting the only criteria available from the record, it is held therefore,

that 34.6% of the coke is consumed as fuel, and is taxable;

that 65.4% of the coke is consumed in the manufacture of the carburetted water gas for resale and is not taxable.

By the terms of submission 65.4% of the $13,385.58 tax is abated.

So Ordered.

DUFRESNE, J., did not sit.